**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

Jackie D. Vogt,

Plaintiff,

v.

Dain Rauscher Incorporated, a Minnesota corporation,

Defendant.

Civ. No. 01-885 (RHK/RLE)
**MEMORANDUM OPINION AND ORDER**

---

William J. Egan, William J. Egan PLC, Edina, Minnesota, for Plaintiff.

Melissa Raphan and Michael Iwan, Dorsey & Whitney, Minneapolis, Minnesota, for Defendant.

---

## Introduction

Beginning in 1997, Plaintiff Jackie Vogt worked in the Duluth, Minnesota, office of Defendant Dain Rauscher, Inc. ("Dain") as a Senior Registered Sales Assistant to broker Glen Bayless. In addition to Vogt's salary, which Dain paid, Bayless paid Vogt a share of his commissions pursuant to an agreement between them. In February 1999, Vogt became pregnant with her first child. After Vogt requested maternity leave, Dain hired Deb Burnes, also a registered sales assistant, to fill in for Vogt with Bayless during her absence. Vogt returned from maternity leave on January 31, 2000, and learned that Bayless had decided not to renew their commission-sharing agreement. Vogt complained to Dain's Human Resources department, alleging that Bayless had made his decision



FILED MAY 14 2002
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD MAY 14 2002
DEPUTY CLERK

because she had had a baby and taken maternity leave. Vogt and Dain reached a settlement whereby Vogt received a salary increase and a lump sum payment and, in exchange, agreed to a general release of claims against Bayless and Dain. Vogt stayed in Dain's Duluth office, working for four new brokers rather than Bayless. Burnes continued to work for Bayless.

After Vogt returned from maternity leave, Bayless and Burnes began to complain that Vogt was engaging in behavior that was hostile and intimidating, including stares directed at Burnes, a statement made to Bayless that "what comes around goes around," and a poem left in Bayless's office mailbox about money and greed. When a "poison pen" letter was sent to Bayless's wife at their home, Dain hired an investigator to look into the incidents at the Duluth office. On May 18, 2000, Vogt was interviewed by a pair of investigators. After confirming that she had done and said several things about which complaints had been made, Vogt was told that she was terminated effective immediately. This suit under Title VII of the Civil Rights Act of 1964 and the Minnesota Human Rights Act ("MHRA") followed. Vogt alleges she was terminated in retaliation for having complained that Bayless had discontinued their commission-sharing arrangement because she had become pregnant. Before the Court is Dain's motion for summary judgment.[1] For the reasons set forth below, the motion will be granted.

---

[1]On May 9, 2002, the Court heard oral argument with respect to the summary judgment motion.

## Background

### I. Vogt's Compensation Agreement with Bayless

Vogt worked for Dain Rauscher in its Duluth, Minnesota, office from 1993 until May 18, 2000. (Iwan Aff. Ex. K (Sept. 15, 2000 Charge of Discrimination).) In 1997, Vogt was a Senior Registered Sales Assistant for Bayless. (Id.) In addition to her salary from Dain, Vogt received a share in Bayless's commissions. (Id.) The broker initiates the commission-sharing arrangement and pays for it in full; Dain has no input into the arrangement. (J. Vogt Dep. at 119.) On October 29, 1998, Vogt and Bayless signed a "Registered Sales Assistant Compensation-Sharing Program Agreement" for the period January 1, 1999 through November 30, 1999 (the "Agreement"). (Iwan Aff. Ex. J (Compensation-Sharing Program Agreement).) Pursuant to the Agreement, Bayless was to pay Vogt a variable percentage of his gross commissions based on his monthly production. (Id.) The Agreement provided that Bayless could rescind the election of monthly pay deductions in writing at any time. (Id.)

### II. Vogt's Pregnancy, Leave of Absence, and Return to Dain

In February 1999, Vogt became pregnant with her first child. (Iwan Aff. Ex. K.) Later that year, Brad Angell, the branch manager for Dain's Duluth office, telephoned Deb Burnes and told her that an assistant (Vogt) to a large producing broker (Bayless) was going on maternity leave and Dain needed an experienced registered assistant to

cover for that person. (Burnes Dep. at 7-8.) Angell described the sales assistant position as a permanent position and he told Burnes that working for Bayless would be a temporary assignment. (Id. at 8, 46.) Burnes began working at Dain in mid-August 1999 and worked with Vogt until Vogt left for maternity leave. (Id. at 15.) On November 1, 1999, Vogt had her baby. (Iwan Aff. Ex. K.) She took three months of maternity leave from Dain, during which time her Agreement with Bayless expired.[2]

On January 31, 2000, Vogt returned from maternity leave and met with Angell and Bayless. (Burnes Dep. at 18, 20.) Angell told her that Bayless would not be renewing their commission-sharing arrangement and that she could either continue to work for Bayless without the commission piece of compensation or work out something else with other brokers in the office. (Vogt Dep. at 174-75.) The commission payments represented a significant percentage of Vogt's total income. Vogt went home upset and returned with her husband, Darren, to meet again with Angell and Bayless. (Vogt Dep. at 194.) Vogt's husband and Angell did most of the talking, and the meeting became heated.[3] (Vogt Dep. at 197; D. Vogt Dep. at 46, 52.) Bayless walked out of the meeting.

---

[2] According to Vogt, Bayless paid her a share of his commissions under the Agreement for the months of November and December, even though the Agreement expired at the end of November and Vogt was out on maternity leave. (J. Vogt Dep. at 153-54.)

[3] The parties present different accounts of what happened in the meeting. Vogt and her husband testified that Angell raised his voice to them, but that they did not raise their voices to either him or Bayless. (Vogt. Dep. at 199-200; D. Vogt Dep. at 46, 52.) Bayless and Angell testified that Vogt's husband was upset and angry – shaking and red

(D. Vogt. Dep. at 52.)

Vogt complained to Jennifer Payne, a Dain Human Resources manager regarding Bayless's decision to cut off her commissions. At the time, Payne noted that Vogt (1) had "raised a concern that [Bayless] did not renew [their] commission sharing agreement because [Vogt] had a baby" and (2) felt that Bayless "never intended to return [Vogt] to the job, hired [her] replacement, and is paying her, not [Vogt]" (Egan Aff. Ex. 3 (undated notes); see also Payne Dep. at 81 (testifying that Vogt had said she thought the commissions were discontinued because Vogt had had a baby and been out on maternity leave).) Payne investigated Vogt's complaints and concluded that there were no facts to support a finding of bias or a violation of the FMLA. (Id.)

On February 10, 2000, Dain offered Vogt the choice of either returning to work as a Senior Registered Sales Assistant or as a Sales Associate supporting senior brokers in the Duluth office. (Iwan Aff. Ex. A (Feb. 10, 2000 letter from Dain to Vogt and General Release).) Regardless of the option Vogt chose, Dain would increase her base salary to $30,000 per year. (Id.) Additionally, to help Vogt transition from a commission-sharing arrangement with Bayless, Dain offered Vogt a lump sum payment of $10,000. (Id.) In exchange for these terms, Vogt was asked to sign a General Release encompassing

---

faced, with a clenched fist – and that he got up out of his chair and stood next to Bayless menacingly. (Bayless Dep. at 60-63; Angell Dep. at 46-49.) Another employee who could see into Angell's office testified that Vogt's husband was visibly angry and was raising his voice. (Anderson Dep. at 26-27.)

> any and all claims, demands, actions, liabilities, damages or rights of any kind, whether known or unknown, that you have, have ever had, or may have through the date of this Release, including but not limited to those arising out of or related to your employment, [Family Medical Leave Act] leave or return to employment.[4]

(Id.) The General Release included a fifteen-day rescission period with respect to claims or potential claims under the MHRA. (Id.) On February 25, 2000, Vogt accepted Dain's offer of continued employment as outlined in the February 10 letter and signed the General Release. (Id.) She did not exercise her right to rescind the release and shortly thereafter began working for a group of four new brokers.[5]

## III. Events Following the Settlement with Vogt

One of the individuals Vogt worked for after returning from maternity leave was Brenda Aslyn. Aslyn testified that Vogt regularly – indeed, nearly daily – commented to Aslyn about being frustrated, angry, and disappointed with the way she had been treated; she felt as though she had been "screwed over" with respect to the loss of income and having to return to a situation that was unfamiliar. (Aslyn Dep. at 44-45.) During the

---

[4] The Release specified that it was intended to extend to and include claims under Title VII, the Americans with Disabilities Act, the Employee Retirement and Income Security Act, the Fair Labor Standards Act, the Family Medical Leave Act, the Minnesota Human Rights Act.

[5] Vogt testified that, when working for Bayless, she had to "go 120 miles an hour for eight hours," often skipping lunch or eating at her desk. (J. Vogt Dep. at 233-34.) By contrast, working for the four new brokers, she could "spread things out at a nice pace . . . actually take an hour lunch . . . [and] leave at 4:30." (Id. at 234.) Vogt testified she was happy with her job after she returned and liked the brokers for whom she worked. (Id.)

two-and-a-half to three months that Vogt served as Aslyn's sales assistant, Vogt's remarks about her anger and frustration never became less frequent. (Id.) Vogt also expressed to Aslyn her feelings that Deb Burnes and come and taken her job and, in essence, also "screwed her over." (Id. at 55.) Aslyn testified that Vogt made faces at Burnes behind her back, glared at her, and on at least once occasion told Aslyn that, if she wanted to, she could make Burnes' life difficult. (Id.) Vogt told another co-employee, Karen Anderson, that she felt she had been demoted; she also stated that she felt angry with Bayless and wanted to do something to hurt him. (Anderson Dep. at 12.)

On February 15, 2000, at the end of her first day working with the new brokers, Vogt went to Bayless's office. (J. Vogt Dep. at 205.) She said to Bayless, "What goes around comes around . . . it all evens out in the end." (Egan Aff. Ex. 4 (Payne's handwritten notes entitled "Series of Events").) Bayless reported Vogt's comments to Human Resources the next day. (Bayless Dep. at 76.) Payne learned from Burnes in mid-February that Vogt was glaring at her and making her feel uncomfortable.[6] (Id.)

On March 1, 2000, Burnes sent an e-mail advising Payne that her verification of deposit for the last pay period was missing from her mailbox. (Burnes Dep. at 32; Iwan Aff. Ex. B (Mar. 1, 2000 e-mail from Burnes).) Burnes stated that, because her paycheck

---

[6] Burnes also testified about an incident in which she had gone to the ladies room at work. Vogt was standing at the mirror, and Burnes went in to one of the stalls. When Burnes came out, Vogt was still there and had turned and was standing facing her, giving Burnes the impression that Vogt had waited for her. She stared at Burnes while Burnes washed her hands and left the restroom. (Burnes Dep. at 30-31.)

was electronically deposited into her account, she did not need a replacement check; she expressed concern, however, about where her deposit statement might have gone. (Id.)

On March 16, 2000, Vogt exchanged a series of e-mails with Kelly Finnegan, a co-employee. Captioned "Goodbye Earl," the e-mails ran as follows:

| | |
|---|---|
| Vogt: | let's go out to the lake<br>I'll pack a lunch<br>and stuff you in the trunk |
| Finnegan: | are you feelin' weak!!!<br>good-bye!!! |
| Vogt: | those black-eyed peas<br>tasted all right to me |
| Finnegan: | and they don't [lose] any sleep!!!<br>we need a break!!!! |
| Vogt: | it turns out he was a missing person<br>that nobody missed at all |
| Finnegan: | well...is that alright???<br>good-bye!!!!!!!!! |
| Vogt: | Goodbye Glen<br>Goodbye Peter<br>Kelly and Jackie sell Tennessee ham and strawberry jam at a roadside stand... |

(Iwan Aff. Ex. C (Mar. 16, 2000 e-mails between Vogt and Finnegan).)[7] Vogt testified

---

[7] The e-mails refer to the lyrics of a song by the Dixie Chicks which tells the story of two female friends, one of whom, Wanda, is married to an abusive man named Earl. After Wanda files for divorce, Earl violates a restraining order and seriously assaults her. The song continues:

that her intent in the exchange of e-mails was to acknowledge that she and Finnegan were letting go of an old part of their lives; Finnegan was divorcing her husband, Peter, and Vogt was no longer working with Bayless. (J. Vogt Dep. at 280.)

On March 22, 2000, Bayless's wife received a "poison pen" note at their home in

---

Right away Mary Anne flew in from Atlanta on a red eye midnight flight.
She held Wanda's hand as they worked out a plan
And it didn't take long to decide

That Earl had to die.
Goodbye, Earl.
Those black-eyed peas, they tasted all right to me, Earl.
You're feeling weak? Why don't you lay down and sleep, Earl.
Ain't it dark wrapped up in that tarp, Earl?

*******

Well, the weeks went by and Spring turned into Summer,
and Summer faded into Fall.
And it turns out he was a missing person who nobody missed at all.

So the girls bought some land and a roadside stand out on Highway 109.
They sell Tennessee ham and strawberry jam,
And they don't lose any sleep at night 'cause

Earl had to die.
Goodbye, Earl.
We need a break.
Let's go out to the lake, Earl.
We'll pack a lunch and stuff you in the trunk, Earl.
Well, is that all right? Good. Let's go for a ride, Earl.

(See Egan Aff. Ex. 13.)

Superior, Wisconsin.[8] (Iwan Aff. Ex. H (anonymous note addressed to Mrs. Bayless).) Put together from letters clipped out of magazines, the note was addressed to "Mrs. Bayless" and read "Your husband fucked my wife." (Id.) That afternoon, Bayless spoke to Payne and told her he was "scared to death." (Egan Aff. Ex. 7 (Mar. 22, 2000 notes by Payne regarding conversation with Bayless); Payne Dep. at 94.) Bayless also told Payne that "one of the two of us [i.e., Bayless or Vogt] is leaving Dain Rauscher." (Id.) Payne contacted an outside security firm to investigate the note. (Payne Dep. at 39-40.)

On April 3, Bayless received an anonymous letter at work, purportedly from a client, stating that Burnes was doing a bad job and that the author wanted Vogt back. (Egan Aff. Ex. 4.) Two days later, Joshua Peters sent a memorandum to Bayless and Angell regarding a conversation he had with Vogt on April 4. (Iwan Aff. Ex. D (Apr. 5, 2000 memo from Peters).) Vogt had called Peters over to her desk and asked why he had been avoiding her (e.g., not saying anything to her when passing her cubicle). (Id.) Peters reported that Vogt told him that Bayless had "really fucked me over," (id.), a statement that Vogt admits having made to Peters. (J. Vogt Dep. at 141.)

On April 17, 2000, Vogt received an e-mail at Dain from a person outside of work concerning a poem about money.[9] (Iwan Aff. Ex. E (Apr. 17, 2000 e-mail from

---

[8] Bayless testified that his telephone number is unlisted and, therefore, his address in not published in the telephone book. (Bayless Dep. at 101.)

[9] Money

Waksdahl to Vogt).) The following day, the poem appeared in Bayless's mailbox at Dain. (Egan Aff. Ex. 4.) Vogt gave Aslyn a copy of the poem and told Aslyn that she had put it in Bayless's box. (Aslyn Dep. at 8, 57, 59-61.)

On April 20, 2000, Bayless sent an e-mail to both Angell and Payne, asking about the status of Powers' investigation. (Egan Aff. Ex. 9 (Apr. 20, 2000 e-mails between Bayless and Payne).) Bayless mentioned the poem placed in his box on the 18th and an incident that day in which a check for him had been found crumpled up after Vogt had

---

It can buy a House
But not a Home

It can buy a Bed
But not Sleep

It can buy a Clock
But not Time

It can buy you a Book
But not Knowledge

It can buy you a Position
But not Respect

It can buy you Medicine
But not Health

It can buy you Blood
But not Life

It can buy you Sex
But not Love

So you see money isn't everything.

been working in the cashier's cage. (Id.; see also Egan Aff. Ex. 4.) Bayless indicated his concern about retaliation of a more violent nature and his desire that a restraining order be put in place, for the benefit of both himself and Burnes, at the same time Vogt was let go. (Egan Aff. Ex. 9.) Later that day, Bayless raised the issue of a restraining order, this time with Payne, stating "I just want to be sure that I'm covering all my bases to keep myself, my family, and my team safe." (Id.)

On May 12, 2000, Cheryl Meese spoke to Angell about a conversation she had with Vogt earlier that day. (Meese Dep. at 18.) According to Meese, Vogt had, on two separate occasions within the space of several days, brought up the idea of "getting back" at Bayless and asked Meese to help her think of a way of accomplishing that. (Meese Dep. at 15-16; see also Egan Aff. Ex. 11 (May 12, 2000 notes by Payne of telephone conversation with Angell).)

On May 18, 2000, George Dovolos contacted Vogt at work and asked her to meet him and another investigator, Tanya Wolfson, to discuss recent events in Dain's Duluth office. Dovolos reviewed several of the above instances with Vogt. Vogt told Dovolos that she had put together an e-mail or two and had a discussion with a few people about her feelings about Bayless. (Dovolos Dep. at 13.) She admitted to writing the "Goodbye Glen" e-mails and said that it was her intent to simply say "goodbye" to her relationship with Bayless. (Id. at 27.) In discussing that exchange of e-mails, Vogt acknowledged that it could be perceived as meaning something more serious. (See id.) Similarly, Vogt

acknowledged to Dovolos that she had talked to a co-employee about helping her think of ways to "hurt" Bayless. (Id. at 46.) Vogt told Dovolos that she had made those statements in jest and, again, acknowledged that they might be perceived as meaning something more serious. (Id.) About forty minutes into the interview, Dovolos told Vogt that she was being terminated by Dain, effective immediately.[10] (Id. at 23-24.) Payne then came into the room and reviewed some papers with Vogt regarding accrued vacation time. (J. Vogt Dep. at 332-33.)

The following morning, Angell sent an e-mail to all Duluth sales assistants and "IEs," advising them that Vogt was no longer with Dain. (Iwan Aff. Ex. F (May 19, 2000 e-mail from Angell).) Vogt requested a written reason for her termination. On June 6, 2000, Dain indicated that she was terminated "due to violation of company policy – non-compliance related. The policy violated was the respectful workplace policy."[11] (Iwan

---

[10] Aslyn testified that sometime prior to or during the investigation, Vogt showed her a list of Bayless's clients and told Aslyn that, if something were to happen to her or if she had to go somewhere else, at least she would have the list to work off of. (Aslyn Dep. at 83-84.)

[11] The Respectful Workplace Policy prohibits employees from

> (1) engaging in harassment based on race, creed, color, religion, national origin, sex, age, disability, marital status, sexual orientation, pregnancy, veteran's status, status with regard to public assistance or membership or activity in a local commission, (2) engaging in sexual harassment, (3) engaging in other harassing or abusive behavior, and (4) conducting Dain Rauscher business in inappropriate locations.

(Iwan Aff. Ex. I (Dain Rauscher Code of Conduct).)

Aff. Ex. G (June 6, 2000 letter from Payne to Vogt).)

On September 15, 2000, Vogt filed a Charge of Discrimination with the Minnesota Department of Human Rights, asserting both sex discrimination and retaliation. (Iwan Aff. Ex. K.) She indicated that the last act of discrimination took place on May 18, 2000, the day she was terminated. (Id.) On March 28, 2001, the EEOC mailed a Notice of Right to Sue letter to Vogt. (Iwan Aff. Ex. M (Notice of Right To Sue – Issued on Request).) This lawsuit followed.

## Analysis

### I Standard of Decision

Summary judgment is proper if, viewing the record in the light most favorable to the nonmoving party, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party bears the burden of showing that the material facts in the case are undisputed. See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Mems v. City of St. Paul, Dep't of Fire & Safety Servs., 224 F.3d 735, 738 (8th Cir. 2000). The court must view the evidence, and the inferences which may be reasonably drawn from it, in the light most favorable to the nonmoving party. See Graves v. Arkansas Dep't of Fin. & Admin., 229 F.3d 721, 723 (8th Cir. 2000); Calvit v. Minneapolis Pub. Schs., 122 F.3d 1112, 1116 (8th Cir. 1997).

> If the party with the burden of proof at trial is unable to present evidence to establish an essential element of that party's claim, summary judgment on the claim is appropriate because "a complete failure of proof concerning an

> essential element of the nonmoving party's case necessarily renders all other facts immaterial."

St. Jude Med., Inc. v. Lifecare Intern., Inc., 250 F.3d 587, 595 (8th Cir. 2001) (quoting Celotex, 477 U.S. at 323 (1986)).

The nonmoving party may not rest on mere allegations or denials, but rather must demonstrate the existence of specific facts that create a genuine issue for trial. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); Krenik v. County of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995). The court does not weigh facts or evaluate the credibility of affidavits and other evidence on a motion for summary judgment. See Liberty Lobby, 477 U.S. at 249. The nonmovant, however, cannot avoid summary judgment in favor of the movant merely by pointing to some alleged factual dispute between the parties. Instead, any fact alleged to be in dispute must be "outcome determinative under prevailing law," that is, it must be material to an essential element of the specific theory of recovery at issue. See Dancy v. Hyster Co., 127 F.3d 649, 652 (8th Cir. 1997); Get Away Club, Inc. v. Coleman, 969 F.2d 664, 666 (8th Cir. 1992).

"Absent direct evidence of discrimination invoking the mixed-motive analysis of Price Waterhouse, the burden-shifting analysis of McDonnell Douglas applies to claims of retaliation." Gagnon v. Sprint Corp., 284 F.3d 839, 849-50 (8th Cir. 2002). Vogt has not pointed to any direct evidence of discrimination in this case. Thus, she must establish a prima facie case of retaliation; if she succeeds in so doing, the burden shifts to Dain to

articulate a legitimate, non-discriminatory reason for its decision to terminate her. The burden then shifts back to Vogt who must either introduce evidence to rebut the employer's justification as a pretext for retaliation, or introduce additional evidence proving actual discrimination. Dain has attacked Vogt's ability to state a prima facie case of retaliation under Title VII and reprisal under the MHRA. The Court therefore begins with the prima facie case.

## II. Prima Facie Case of Retaliation under Title VII and Reprisal under MHRA

To establish a prima facie case of retaliation under Title VII, Vogt must show that "(1) she engaged in statutorily protected activity; (2) an adverse employment action was taken against her; and (3) a causal connection between the two events. The same standards apply to MHRA reprisal claims." LaCroix v. Sears, Roebuck, and Co., 240 F.3d 688, 691 (8th Cir. 2001) (internal citations omitted). The parties do not dispute that Vogt can present evidence of an adverse employment action -- termination. Rather, the parties dispute (a) whether Vogt engaged in statutorily protected activity and, (b) if so, whether there is evidence sufficient to give rise to an inference of a causal link between Vogt's complaints to Human Resources and her termination.

### A. Statutorily Protected Activity

The Eighth Circuit has recently observed that "'[p]rotected activities' under Title VII include much more than merely filing a formal charge of harassment." Gagnon, 284 F.3d at 854 n.4. "Protected activities" encompass recourse to an employer's internal

administrative processes and informal complaints to superiors.[12] Id. In the present case, after learning from Angell, the branch manager for the Duluth office, that she would no longer be receiving commission-sharing payments from Bayless, Vogt went to the human resources manager, Payne, and complained. Payne's notes indicate that she understood Vogt to be claiming that Bayless had decided not to renew their commission-sharing agreement because she had had a baby. (Egan Aff. Ex. 3.) A reasonable jury could find that Vogt's informal complaint to the Human Resources department questioned whether Bayless's decision had been based on her pregnancy (i.e., "gender-plus" discrimination). Such a complaint is a statutorily protected activity, satisfying the first element of Vogt's prima facie case.

### B. Causal Link Between Protected Activity and Employment Action

Dain contends that, even viewing the record in the light most favorable to Vogt, there is not sufficient evidence to reasonably support an inference that Vogt was terminated because she complained about Bayless's decision not to renew their commission-sharing arrangement. The Eighth Circuit has recently considered the type of

---

[12] The Eighth Circuit in Gagnon cites recent cases from several other circuits to illustrate this point. See Fierros v. Texas Dep't of Health, 274 F.3d 187, 194 (5th Cir. 2001) (recognizing internal discrimination complaints and the use of an employer's internal administrative processes to be "protected activities"); Raniola v. Bratton, 243 F.3d 610, 624 (2d Cir. 2001) (finding internal complaint to be a qualified "protected activity" and citing authority noting that "Congress sought to protect a wide range of activity in addition to the filing of a formal complaint"); O'Neal v. Ferguson Constr. Co., 237 F.3d 1248, 1255 (10th Cir. 2001) (finding informal complaints to superiors are a "protected activity").

evidence necessary to substantiate a causal connection between "protected activity" and an adverse employment action:

> We have held that evidence that gives rise to "an inference of retaliatory motive" on the part of the employer is sufficient to establish a causal link. See Rath v. Selection Research, Inc., 978 F.2d 1087, 1090 (8th Cir. 1992); Couty v. Dole, 886 F.2d 147, 148 (8th Cir. 1989). We now make explicit what we think was already implicit, namely, that evidence that gives rise to an inference of such a motive is not only sufficient to prove the required causal link but is also necessary.

Kipp v. Missouri Highway and Transp. Comm'n, 280 F.3d 895, 897 (8th Cir. 2002) (emphasis added). Vogt points to six categories of evidence that, she claims, give rise to an inference of retaliatory motive:

> (1) the temporal proximity between Vogt's discrimination complaint and her termination (three and a half months);
>
> (2) Bayless's refusal to speak to Vogt after her return to work;
>
> (3) Bayless's statement to Payne on March 22, 2000 that "one of the two of us [i.e., Bayless or Vogt] is leaving Dain Rauscher";
>
> (4) Bayless's professed ignorance of the decision to terminate Vogt's employment and the reasons for her termination, which Vogt contends is false when one also considers Bayless's April 20, 2000, e-mails to Payne and Angell insisting that a restraining order be put in place at the same time Vogt is terminated;
>
> (5) Bayless' reply of "Yup, it sure does," to Vogt's statement that "What comes around goes around . . . it all evens out in the end"; and
>
> (6) Dain's failure to question Vogt (as described in Dain's internal policy guides) about any of the alleged violations of the Respectful Workplace policy before deciding to terminate her.

(Pl.'s Mem. Opp'n to Summ. J. at 19-20.) Vogt further argues that "the timing element alone is sufficient to establish a causal connection" between the protected activity and her termination. (Id. at 20.) That latter assertion, however, is contrary to Eighth Circuit precedent.

In Kipp, the Eighth Circuit reiterated that "[g]enerally, more than a temporal connection . . . is required to present a genuine factual issue on retaliation." Kipp, 280 F.3d at 897 (quoting Kiel v. Select Artificials, Inc., 169 F.3d 1131, 1136 (8th Cir. 1999). A two-month interval existed between Kipp's formal complaint that she had not been promoted because of her gender and her termination. Id. The Court of Appeals concluded that such an interval "so dilutes any inference of causation that we are constrained to hold as a matter of law that the temporal connection could not justify a finding in Ms. Kipp's favor on the matter of causal link." Id. (emphasis added). In the present case, the time gap is larger: three and a half months. Thus, in light of Kipp, the timing of Vogt's termination cannot alone, as a matter of law, establish a causal link.

Of the remaining five items that Vogt claims supports an inference of retaliatory motive, four are statements or actions taken by Bayless. Dain has presented evidence that brokers, including Bayless, do not have the authority to hire or fire other employees; such authority belongs to the branch manager, Angell. (See Bayless Dep. at 40; Payne Dep. at 28.) Dain argues that Bayless is not a decision-maker and, therefore, his remarks or actions cannot give rise to an inference of retaliatory animus. See Scusa v. Nestle U.S.A.

Co., 181 F.3d 958, 969-70 (8th Cir. 1999).

Vogt responds that Bayless's April 20 e-mail about getting a restraining order in place "at the same time [Vogt] is let go" supports an inference that Bayless had knowledge of and involvement in her termination. (Pl.'s Mem. Opp'n to Summ. J. at 12.) Mere knowledge of an adverse employment decision is not a sufficient basis for imputing a co-employee's words or actions to the employer as evidence of retaliatory animus. Rather, the co-employee must have influenced or been significantly involved in the adverse employment decision. See Hudson v. Norris, 227 F.3d 1047, 1053-54 (8th Cir. 2000) (holding that officer who viewed plaintiff as an "undesirable choice" for promotion and forwarded selection committee evaluations to the ultimate decision-maker exercised no influence over the decision not to promote plaintiff); compare Bergene v. Salt River Project Agric. Imp. and Power Dist., 272 F.3d 1136, 1141 (9th Cir. 2001) (holding that former manager who advised decision-maker to change the qualifications for a position in a way that disadvantaged plaintiff and provided the decision-maker with an assessment of plaintiff's abilities did play an influential role in selection process). Thus, only comments demonstrating a discriminatory animus that were made by individuals closely involved in the decision-making process can be evidence that an impermissible factor was a motivating factor for that decision. See Stacks v. Southwestern Bell Yellow Pages, Inc., 27 F.3d 1316, 1323 (8th Cir. 1994).

The e-mails from Bayless do not adequately support a finding, or even an

inference, that Bayless was significantly involved in or had input into the decision to terminate Vogt. The e-mails concern Bayless's perceived need for a restraining order; they originated with him (as opposed to being solicited by Bayless or Payne) and were made in response to events that could reasonably be characterized as hostile or intimidating. If, as Vogt argues, Bayless's "ultimatum" that either he or Vogt must go caused Dain to evaluate the relative economic value of the two employees to the organization, such an analysis, in and of itself, is obviously not discriminatory. To place a discriminatory cast on Dain's decision, Vogt contends that Bayless wanted to get back at her because he was personally and professionally "embarrassed" by the settlement Dain reached with Vogt. Such a contention is not supported by the record.

As for Dain's alleged failure to comply with internal procedures for investigating the inappropriate occurrences in the workplace, the record reflects that Vogt was indeed interviewed by an investigator (Dovolos), to whom she acknowledged having done several of the things that had been complained about, including stating that she wanted to find a way to hurt Bayless, sending an e-mail that could reasonably be construed as meaning that Vogt wanted to kill Bayless, and telling a co-worker that Bayless had "fucked [her] over." Given her acknowledgment of those actions, Vogt was terminated.

Vogt has not come forward with sufficient evidence to give rise to a reasonable inference that there is a causal link between her termination and her complaint about Bayless's decision not to renew their commission-sharing arrangement. Therefore, Vogt

does not state a prima facie case of either retaliation under Title VII or reprisal under the Minnesota Human Rights Act.[13] Accordingly, summary judgment is appropriate as to both claims, and the Complaint is dismissed with prejudice.

## Conclusion

Based on the foregoing, and all of the files, records and proceedings herein, **IT IS ORDERED** that the Defendant Dain Rauscher's Motion for Summary Judgment (Doc. No. 27) is **GRANTED.** The Complaint (Doc. No. 1) is hereby **DISMISSED WITH PREJUDICE**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: May 14, 2002

RICHARD H. KYLE
United States District Judge

[13] Even if Plaintiff had established a prima facie case of retaliation or reprisal, she has failed to produce evidence that Defendant's reasons for firing her were pretextual. See Scroggins v. University of Minnesota, 221 F.3d 1042, 1045 (8th Cir. 2000).

# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

## CIVIL NOTICE

DATE MAILED TO COUNSEL/PRO SE PARTIES:

The purpose of this notice is to summarize the time limits for filing with the District Court Clerk's Office a Notice of Appeal to the Eighth Circuit Court of Appeals from a final decision of the District Court in a civil case.

***This is a summary only. For specific information on the time limits for filing a Notice of Appeal, review the applicable federal civil and appellate procedure rules and statutes.***

Rule 4(a) of the Federal Rules of Appellate Procedure (Fed. R. App. P.) requires that a Notice of Appeal be filed within:

1. Thirty days (60 days if the United States is a party) after the date of "entry of the judgment or order appealed from;" or

2. Thirty days (60 days if the United States is a party) after the date of entry of an order denying a timely motion for a new trial under Fed. R. Civ. P. 59; or

3. Thirty days (60 days if the United States is a party) after the date of entry of an order granting or denying a timely motion for judgment under Fed. R. Civ. P. 50(b), to amend or make Additional findings of fact under Fed. R. Civ. P. 52(b), and/or to alter or amend the judgment under Fed. R. Civ. P. 59; or

4. Fourteen days after the date on which a previously timely Notice of Appeal was filed.

If a Notice of Appeal is not timely filed, a party in a civil case can move the District Court pursuant to Fed. R. App. P. 4(a)(5) to extend the time for filing a Notice of Appeal. This motion must be filed no later than 30 days after the period for filing a Notice of Appeal expires. If the motion is filed after the period for filing a Notice of Appeal expires, the party bringing the motion must give the opposing parties notice of it. The District Court may grant the motion, but only if excusable neglect or good cause is shown for failing to file a timely Notice of Appeal.

C:\FORMS\APPEAL NO. CIV
Rev. August 11, 1995

# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

### Prehearing Conference Program

The United States Court of Appeals for the Eighth Circuit has established an early intervention Prehearing Conference Program. The purpose of the program is twofold: (1) to facilitate settlement discussions in civil cases by providing an impartial atmosphere for an open discussion of the case and alternative methods of disposition and (2) to promote the delineation of issues, early resolution of procedural problems, and effective administration of an appeal throughout the appellate process. See 8th Cir. R. 33A.

The program is directed by Mr. John Martin. Mr. Martin screens newly filed appeals based on information furnished by both appellants and appellees in the court's Appeal Information Forms A and B. Contact with counsel is by telephone and in personal conferences held in several cities throughout the Circuit. All communications with Mr. Martin are confidential. Counsel can openly discuss and evaluate the issues and explore alternatives in a non-adversarial setting without fear that the subsequent processing of the appeal or ultimate disposition of the case will be adversely affected by participation in the program.

Participation in the program is voluntary. However, the Court strongly encourages your participation and cooperation. Over the past twenty years, the program has enabled many appellate litigants to achieve mutually satisfactory resolution of certain issues or an overall settlement prior to progressing through all stages of the appellate process. Issue delineation enables counsel to focus only on those issues that need judicial resolution. The program has helped relieve the ever-increasing caseload confronting the Court, and it has also saved litigants and attorneys substantial amounts of time and money.

In order for the program to function effectively certain information must be provided at the initiation of the appeal. *Eighth Circuit Rule 3B directs each civil appellant to: (1) file a completed Appeal Information Form A with the Notice of Appeal at the time the Notice is filed with the District Court clerk and (2) forward a copy of the completed Form A and a copy of Appeal Information Form B to the appellee for completion.* Appellee may complete Form B and send it to the clerk of the Court of Appeals. If you have any questions about the Prehearing Conference Program or the Appeal Information Forms, please contact Mr. Martin at (314)-539-3669.

Forms A and B are available from the District Court clerk and the Court of Appeals clerk and can be found at the Court of Appeals' web site at: www.ca8.uscourts.gov

*June 1, 2000*